UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA NOWRANG,
                                    Petitioner,

                    -v-

GRIFFIN THOMAS, *Superintendent*,
                                    Respondent.

17-CV-1017 (JPO)

<u>OPINION AND ORDER</u>

J. PAUL OETKEN, District Judge:

Following a 2007 jury trial in New York state court, Petitioner Joshua Nowrang was

convicted of Murder in the Second Degree in violation of New York Penal Law § 125.25(1) and

sentenced to an indeterminate prison term of twenty-five years to life.  (Dkt. No. 12 ¶ 7.)  Having

unsuccessfully sought to vacate his conviction through appellate and post-judgment proceedings

in New York's courts (Dkt. No. 12 ¶¶ 8–10), Nowrang now turns to federal court, petitioning for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the ground that his trial counsel was

constitutionally ineffective (Dkt. No. 1).  For the reasons that follow, Nowrang's petition is

denied.

I.      **Background**

The instant case arises from Nowrang's conviction in New York Supreme Court, Bronx

County, for the July 6, 2005 murder of his romantic partner, Rawayti Haimraj, known as

"Anita."[1]  (Dkt. No. 1 ("Pet. Memo.") at 2–4.)  Contending that New York's courts unreasonably

concluded that the criminal proceedings that led to his conviction and present incarceration

satisfied constitutional requirements, Nowrang asserts that he is being held "in custody in

---

[1] Consistent with the trial record in this case, this opinion refers to some individuals
involved in the underlying events by first name or nickname.

violation of the Constitution," 28 U.S.C. § 2254(a), and is entitled to a writ of habeas corpus under federal law.

### A.    Factual Background

The following factual recitation derives from the evidence presented at Nowrang's trial.[2]

Prior to her murder, Anita Haimraj was living with Nowrang and their two children, Vanessa and Leon, in one unit of a three-family house on Story Avenue in the Bronx.  (Tr. 138:25–140:1, 361:9–12.)  The house was deeded to one of Anita's sisters, Dropattie Singh, known as "Varo," but Anita was the one who made the mortgage payments and who acted as the landlord for the tenants in the house's other units.  (Tr. 137:3–8, 140:9–19, 142:21–23, 362:3–5.)

The house was a source of conflict between Nowrang and Anita.  Leon, the couple's eighteen-year-old son, testified that during the spring of 2005 Nowrang would initiate arguments about "[m]oney and the house"—specifically, about "selling the house and splitting the money" or about "money that [Anita] had in the bank"—roughly "[e]very other week."[3]  (Tr. 315:3–5, 321:6–24.)  And Zeena Martinez, Anita's friend, testified that Anita had once confided that she refused to marry Nowrang because "he had been threatening to kill her."  (Tr. 40:20–22, 51:9–16.)  Zeena explained that Anita "was scared that if she did marry him, he would kill her, and her children would end up on the streets" because "all [Nowrang] want[ed]" from her was the house. (Tr. 51:16–20.)

---

[2] The 756-page transcript of Nowrang's trial begins at page 69 of Docket Number 14-4 and runs to page 9 of Docket Number 14-31.  For simplicity's sake, citations to the trial transcript (abbreviated "Tr.") employ the pagination of the original document.

[3] One of Anita's tenants also testified to hearing occasional arguments between Nowrang and Anita during this period.  (Tr. 362:3–5, 395:11–25.)  Nowrang's mother, however, testified that she heard no such arguments and that she believed Nowrang's relationship with Anita to be "very good."  (Tr. 586:8–14.)

During the couple's arguments, Nowrang sometimes became violent. For example, in November 2004, Anita showed Zeena a black eye that, Anita said, Nowrang had inflicted.[4] (Tr. 45:25–47:16.) Over the next few months, Anita told Zeena that Nowrang "had begun making unorthodox and unusual sexual demands of her" and would choke her if she failed to comply. (Tr. 49:18–50:11.) On one occasion, Anita further related, Nowrang hit her in front of their daughter, Vanessa, which made her "scared" that he might "start[] to hit the children." (Tr. 50:12–51:8.)

Around this time, Zeena also began to notice that Anita was losing weight and acting uncharacteristically depressed. (Tr. 45:10–21, 48:24–49:17.) Richard Rogich, a retired police officer and Anita's neighbor during this period, similarly testified to a June 2005 conversation he had with Anita in which her "whole personality was different." (Tr. 415:23–416:18, 418:16–419:17.) During this conversation, Anita confided that she was arguing with Nowrang "a lot" and that he was trying to limit her contact with friends and family.[5] (Tr. 420:3–18.) Believing that "there was something up," Richard gave Anita his cell phone number and told her to call if she had questions about "getting domestic violence officers over." (Tr. 420:24–421:14.) Anita entered Richard's number into her phone as the first speed-dial entry. (Tr. 421:20–422:16.)

Soon enough, the police did become involved. Around 4:30 on the morning of June 18, 2005, Anita's downstairs tenant, Bhagmatty Ramharakh, known as "Preea," woke to a "loud bang" and the sounds of Nowrang and Anita arguing upstairs. (Tr. 359:25–360:2, 364:13–15, 365:24–366:13.) Leon, too, was roused by the "weird noises" coming from his parents'

---

[4] Anita's sister, Varo, also testified to having seen Anita's black eye, as well as bruises on Anita's face and arms. (Tr. 153:6–14.)

[5] Varo testified that Nowrang would "abuse" Anita if Varo called the Story Avenue house, and that Anita had consequently directed Varo to stop calling the house's landline. (Tr. 145:24–146:10.)

bedroom, and he went to investigate. (Tr. 327:18–328:21.) Upon entering the bedroom, Leon discovered Nowrang, naked, pinning Anita to the floor and grabbing her by the hair and neck. (Tr. 328:22–329:7, 331:17–18.) Leon separated his parents, and Nowrang, who had received an injury, called the police. (Tr. 331:19–333:19.) According to Leon, the police, after interviewing those present, placed Nowrang in handcuffs and removed him from the scene.[6] (Tr. 336:6–337:15.) Following Nowrang's arrest, Anita showed Leon and Preea a mark on her skin where Nowrang had bitten her, and she later explained that Nowrang had initiated the fight after she refused to have sex with him. (Tr. 159:19–24, 338:1–339:3, 371:3–372:17.)

Anita's friends and family responded with support. That day, Varo, who held the deed to the Story Avenue house, offered to transfer title to Anita. (Tr. 141:20–142:18.) Anita, however, declined, saying, "If I take it, it will all be gone and I want it for my two children, so I'm not ready." (Tr. 142:19–20.) Another of Anita's sisters, Parbattie Parasram, known as "Angie," responded to Nowrang's reported conduct by telling Anita, "[T]his guy is going to kill you, it's time to leave," and inviting Anita to live with her. (Tr. 185:20–22, 198:22–199:8.) And once Richard, Anita's neighbor, learned what had happened, he urged Anita to press charges, although she was unwilling to do so. (Tr. 424:12–425:5.) Richard thereafter confronted Nowrang, who admitted that he had hit Anita and said, "I'm sorry, I got to change my ways." (Tr. 427:15–428:2.)

Before long, however, the situation once again escalated. On July 3, 2005, one day after Anita reported to her friend Zeena that she had terminated her relationship with Nowrang, Anita and Nowrang encountered one another at a party that Anita's tenant, Preea, was hosting at the

---

[6] Preea's recollection differed somewhat. According to her, Nowrang was taken away in an ambulance, rather than by the police. (Tr. 368:17–369:8.)

Story Avenue house.  (Tr. 51:21–52:17, 199:11–200:1.)  At the party, Nowrang found himself unable to persuade Anita to dance with him, and so—according to Anita's sister, Angie, who was present as well—he head-butted Anita and dumped his drink on her.[7]  (Tr. 202:15–205:11.) Angie demanded that Nowrang explain himself, and he responded by slapping Anita across the face.  (Tr. 208:12–22.)

Another of Anita's sisters, Kaloutie Pooran, known as "Seeta," arrived on the scene soon after and found Anita in tears, with a red, swollen mark on her forehead.  (Tr. 156:2–6, 163:4–22.)  Seeta confronted Nowrang, who replied that Seeta should tell Anita to sell the house and give him half of the proceeds so that he could "move on."  (Tr. 164:2–12.)  Seeta reminded Nowrang that the house was not in Anita's name, and Nowrang responded, "[Y]ou guys should have to rob me, when I am finished with you[,] you will have to put your hands on your head and cry for the rest of your life."  (Tr. 164:12–18.)

Provoked, Angie called the police, who reported to the scene and questioned those present.[8]  (Tr. 210:13–211:7, 640:24–641:22.)  Ultimately, though, Anita said that she did not wish to press charges, and the police left without making any arrests.  (Tr. 211:5–7, 642:17–21.)

Anita was heard from for the last time just two days later.  Around 9:00 on the morning of July 5, 2005, Anita called Seeta and said that Nowrang was following her around the house and asking for money.[9]  (Tr. 165:2–11.)  Knowing that Anita's children were both away—

---

[7] Nowrang's sister, who also observed these events, testified that Nowrang's actions appeared to have been accidental.  (Tr. 635:15–19, 639:14–640:18.)

[8] According to Nowrang's sister, Seeta tried to answer all of the officers' questions herself and would not allow Anita to get a word in edgewise.  (Tr. 642:1–13.)

[9] Preea, Anita's tenant, also testified as to Nowrang's behavior that morning.  According to Preea, when she saw Nowrang as she was leaving for work, Nowrang complained to her about Anita's refusal to sleep with him and then discussed his desire to mortgage the Story Avenue house.  (Tr. 380:6–383:25.)  Both of these topics struck Preea as "unusual."  (*Id.*)

Vanessa was staying with a relative in Queens and Leon was in Trinidad with Nowrang's mother—Seeta advised Anita to get out of the house.[10]  (Tr. 165:13–21, 344:6–16, 591:15–21.) After Anita left for work that afternoon, she reported twice to Seeta—once around 5:00 and once around 10:00—that Nowrang was repeatedly trying to contact her, prompting Seeta to respond, "[Y]ou know what kind of husband you have, why did you send your kids [away]."  (Tr. 166:5–167:9.)  Anita, however, maintained that sending the children away had not been her idea.  (Tr. 167:9.)  Seeta then invited Anita to come stay with her, but Anita declined, reassuring Seeta that Nowrang would probably be asleep by the time she got home.  (Tr. 167:19–23.)

Early the next morning (July 6), around 4:00, Preea, Anita's downstairs tenant, woke up to a noise coming from Anita's unit "like somebody fell on the floor."  (Tr. 385:8–12.)  Preea listened for signs of an argument, but she heard only the sound of a thick plastic bag being opened.  (Tr. 386:7–387:13.)  Shortly thereafter, between 4:30 and 5:00, Kamla Gokhul, another of Anita's neighbors, saw Anita's car pull out from behind the Story Avenue house; about an hour later, Kamla saw the car return.  (Tr. 399:9–15, 403:2–404:10.)  When Kamla left for work a bit later, she saw Nowrang sitting on his front stoop, which seemed to have been recently washed.[11]  (Tr. 404:18–405:21, 407:4–10.)  Upon seeing Kamla, Nowrang asked her whether the security camera in front of her house was working—a topic into which he had never before inquired.  (Tr. 406:11–25.)

As the day got underway, Anita's family gradually came to realize that she was missing. Starting around 7:00 a.m., Seeta made several unsuccessful calls to Anita's cell phone.  (Tr.

---

[10] According to Leon, his trip to Trinidad had not been planned very far in advance, but Nowrang's mother testified that the trip had been under discussion for some time.  (Tr. 344:17–19, 589:1–24.)

[11] While other witnesses maintained that it had been raining that morning, Kamla testified that there had been no rain.  (Tr. 410:5–6, 429:11–14.)

168:1–9.)  She then called the Story Avenue house and spoke with Nowrang, who had taken the

day off work.  (Tr. 168:8–11.)  Nowrang said that Anita had come home the previous night while

he was sleeping on the sofa.  (Tr. 168:17–20.)  Seeta was temporarily mollified, but after she

continued to find herself unable to reach Anita—or anybody with news of her whereabouts—she

grew increasingly concerned and contacted Nowrang twice more:  The first time, Nowrang told

her that he did not know where Anita was but that she had put chicken in the sink to defrost.  (Tr.

169:7–12.)  The second time, he said that Anita might be with her sister, Lisa.  (Tr. 169:13–

170:13.)  Seeta, who had just spoken with Lisa, rejected this suggestion and said, "What did you

do to my sister? . . .  [I]f you do anything to my sister you will sit in jail for the rest of your

life."[12]  (Tr. 170:13–23.)

Meanwhile, Varo, alerted to Anita's absence, sent some relatives to check for Anita at the

Story Avenue house.  (Tr. 146:14–147:6.)  The relatives found no sign of Anita, but they

reported to Varo that they had seen flowers and balloons at the house.  (Tr. 147:7–21.)  This

report concerned Varo because, according to her, "whenever [Nowrang] beats [Anita], he buy[s]

balloons and flowers and tell[s] her how much he loves her."  (Tr. 147:21–24.)  Increasingly

alarmed, Varo met with other family members at another sister's house and called the police.[13]

(Tr. 148:14–21, 171:22–172:3.)  While Anita's family waited for the police to arrive, Nowrang

joined the group, said, "I'm sorry," and started to cry.  (Tr. 149:1–3.)

---

[12] In the meantime, around 10:00 or 11:00 in the morning, Anita's neighbor, Richard, received a phone call from one of his neighbors, informing him that she had just seen Nowrang hit Richard's fence while driving Anita's car.  (Tr. 431:12–432:3, 437:13–438:2.)  Upon inspection, Richard discovered that his fence was indeed dented and that the paint on Anita's car had been scraped.  (Tr. 432:6–19.)  Thereafter, Richard observed Nowrang in the car, "flying up and down the driveway" of the Story Avenue house, at least twice more that day.  (Tr. 434:15–25.)

[13] Another of Anita's sisters, Angie, also independently contacted the police after she found herself unable to locate Anita.  (Tr. 215:2–23.)

When the police arrived, the assembled family members explained what had happened. (Tr. 149:18–21.) As the police spoke with Nowrang, Anita's sister, Angie, heard Nowrang tell the police—contrary to what he had earlier told Seeta—that Anita had not returned home the night before. (Tr. 217:4–7.) For her part, Seeta heard Nowrang say that he had gone out fishing earlier that day. (Tr. 172:18–21.) Knowing fishing to be an unusual activity for Nowrang, Seeta suggested to her relatives that they "run to the water" at nearby Castle Hill Park. (Tr. 172:22–173:12.)

At the park, Anita's family members discovered human remains on the rocks along the shore. (Tr. 219:8–14.) New York City Police Department ("NYPD") Officer Michael Weiss, who had been summoned to the park in response to the family's discovery, searched the park and found two hands, a foot, a forearm, and a human head, shorn of all its hair. (Tr. 65:18–70:15.) Anita's family members were able to identify some of these remains as Anita's. (Tr. 71:24–72:1, 219:23–220:3.)

While these discoveries were taking place, Nowrang had taken himself to a local NYPD precinct office to report Anita as missing. (Tr. 566:13–24.) There, Nowrang was interviewed by Detective Robert Grant of NYPD's Bronx Homicide Task Force. (Tr. 561:23–562:3, 567:15–23.) Nowrang began the interview by telling Detective Grant that Anita had come home for about ten minutes around 11:30 the previous night, and that he had fallen asleep shortly after she left. (Tr. 571:10–572:13.) Nowrang next gave an account of his activities prior to his arrival at the precinct office that day: He said that he had woken up around 8:00, purchased a cooler for a planned fishing outing, returned some garbage bags to the house after realizing that there was no

trash collection scheduled for that day, and then went fishing for about forty-five minutes.[14]  (Tr. 572:10–574:22.)  In addition, Nowrang told Detective Grant that his relationship with Anita was generally good, and that he planned to marry her for citizenship purposes, but that Anita's sisters had been "trying to tell [Anita] to do things to him to get rid of him" because they were "basically trying to Americanize her" and "interfer[e] in their relationship."  (Tr. 576:6–19, 577:8–17.)

The next day, Detective Edward Dingman, of the NYPD Detective Bureau's Crime Scene Unit, and Detective John Murray, of NYPD's Bronx Homicide Task Force, were among those who searched the Story Avenue house.  (Tr. 238:15–22, 246:13–247:13, 468:15–23, 473:9–12.)  According to Detective Dingman, the house was "very meticulous, immaculate, very clean," and neither detective found any blood or signs of struggle, forced entry, or theft.  (Tr. 270:9–13, 278:21–279:22, 473:5–23.)  Detective Dingman did, however, remark a pair of damp shorts hanging on a clothesline, and at some point that day or thereafter Detective Murray saw a hair trimmer that had been stored in a kitchen drawer.[15]  (Tr. 280:19–281:5, 480:1–6.)  In addition, a plastic garbage bag was found in the trunk of Anita's car, and Anita's sister, Angie, later discovered Anita's cell phone under a vanity in Anita's daughter's bedroom.  (Tr. 222:14–223:20, 282:8–11.)

All the while, more human remains were washing ashore.  On July 8, 2005, two thighs and a forearm were discovered at Ferry Point Park in the Bronx.  (Tr. 105:20–23, 108:11–15.)

---

[14] There was a cooler present at the crime scene in Castle Hill Park, but Detective Grant testified that it was "clearly" not the cooler that Nowrang had purchased that morning.  (Tr. 573:19–574:3, 581:13–20.)

[15] Leon testified that Nowrang ordinarily stored a hair trimmer in the bathroom.  (Tr. 340:5–19.)

Four days later, on July 12, 2005, a torso with an incision running from the chest to the pubis was recovered from a seawall near Whitestone, Queens. (Tr. 111:12–18, 114:18–115:22.) And finally, on July 24, 2005, a human thigh bone was found underneath the Throgs Neck Bridge. (Tr. 118:24–119:4.) According to Sergeant Paul Reynolds of NYPD's Harbor Unit Scuba Team, the condition and location of these additional remains were consistent with the remains having initially entered the water at Castle Hill Park in the early morning of July 6, 2005. (Tr. 287:21–288:2, 303:1–304:14.)

Dr. Carolyn Kappen, a medical examiner in New York City's Office of the Chief Medical Examiner, performed an autopsy on some of these remains. (Tr. 483:20–484:10, 490:8–15.) In her view, Anita had been killed by "neck compression and . . . blunt impact injuries [to] the head." (Tr. 534:16–23.) In particular, Dr. Kappen explained at trial that the injuries on Anita's head and neck were consistent with a situation in which Anita's assailant had compressed Anita's throat with one hand while using the other hand to hold her by the hair and strike her head against the floor.[16] (Tr. 539:3–540:2.)

In Dr. Kappen's opinion, it was only postmortem that Anita's body was "disarticulated," *i.e.*, cut apart at the joints, and that her head was shaved.[17] (Tr. 493:13–495:24.) Because the disarticulation would have released a great deal of blood, Dr. Kappen believed that it most likely took place outdoors at Castle Hill Park, where the blood could have washed away. (Tr. 499:17–501:5.) The entire process of disarticulating Anita's body, in Dr. Kappen's view, could have

---

[16] Dr. Kappen also testified that there were bite marks on Anita's arm that had occurred right around the time of death. (Tr. 545:10–23.)

[17] Testimony at trial indicated that Anita's killer may have disarticulated her body and cut open her abdominal cavity in an effort to reduce the chances that the body would float after it had been thrown into the water. (Tr. 117:17–118:7, 297:16–298:24.) As for shaving Anita's head, Dr. Kappen testified that it likely served no purpose other than to "dehumanize" the body. (Tr. 496:8–497:9.)

taken as little as fifteen to twenty minutes for somebody with "a very good knowledge of anatomy," although it would have required "maybe a little longer" for someone "not well practiced and schooled."[18]  (Tr. 501:13–24.)

### B.    Procedural Background

On December 28, 2005, the Grand Jury of Bronx County returned an indictment against Nowrang, charging him with one count of Murder in the Second Degree, N.Y. Penal Law § 125.25(1), in connection with Anita's death.  (Dkt. No. 12 ¶ 4.)  The case proceeded to trial in November 2007, and a unanimous jury returned a guilty verdict on December 12, 2007.  (Dkt. No. 12 ¶ 7; Tr. 752:5–753:22.)  Nowrang was thereafter sentenced to an indeterminate prison term of twenty-five years to life.  (Dkt. No. 12 ¶ 7.)  Throughout these stages, Nowrang was represented by Michael L. Leavitt ("Trial Counsel").  (Dkt. No. 12 ¶¶ 5, 7.)

In January 2013, Nowrang, having retained new counsel, appealed his conviction to the Appellate Division of the New York Supreme Court, First Judicial Department (the "Appellate Division").  (Dkt. No. 12-2.)  On appeal, Nowrang argued that: (1) Trial Counsel had afforded him constitutionally ineffective assistance; (2) the jury's verdict had been inadequately supported by, or against the weight of, the evidence; and (3) the admission of hearsay evidence at trial had deprived him of his right to due process.  (Dkt. No. 12-2 at i.)  The Appellate Division affirmed, concluding that Nowrang's ineffective-assistance claim was unreviewable on direct appeal and

---

[18] Robert Yee, a medical legal investigator in New York City's Office of the Chief Medical Examiner, testified that it is "not too difficult" to disarticulate a human body if given the proper tools—"[s]omething thin and something very sharp"—though he observed that the disarticulation in this case had been performed especially "skillfully."  (Tr. 85:23–86:12, 96:1–8, 100:2–10.)

that his other claims lacked merit.[19]  *People v. Nowrang*, 992 N.Y.S.2d 407 (App. Div. 1st Dep't

2014).  Nowrang then unsuccessfully applied for leave to appeal the Appellate Division's ruling

to the New York Court of Appeals.  *People v. Nowrang*, 25 N.Y.3d 1168 (2015).

His appellate options exhausted, Nowrang next sought post-judgment relief by filing an

August 20, 2015 motion in Bronx Supreme Court to vacate his judgment of conviction pursuant

to New York Criminal Procedure Law § 440.10.  (Dkt. No. 12-5.)  In support of this motion,

Nowrang once again argued that Trial Counsel had been constitutionally ineffective.  (*Id.*)  The

court denied Nowrang's motion on November 10, 2015, concluding that Trial Counsel had

"exhibited a complete familiarity with the facts of [Nowrang's] case and the relevant principles

of evidentiary, substantive and procedural law" and had "competently represented [Nowrang]

during each stage of the pretrial and trial proceedings."  (Dkt. No. 12-7 at 10–11.)  On

January 21, 2016, the Appellate Division denied leave to appeal.  (Dkt. No. 12-8.)

Soon thereafter, Nowrang learned that a statement Trial Counsel had made in an affidavit

filed in opposition to Nowrang's initial post-judgment motion had been false.  Consequently, on

October 14, 2016, Nowrang filed a motion in Bronx Supreme Court to renew and reargue his

post-judgment motion.  (Dkt. No. 12-9.)  In a December 15, 2016 opinion, the court granted

Nowrang's motion to reargue but declined to vacate Nowrang's conviction, holding that Trial

Counsel's false statement had not influenced its earlier determination that Nowrang had received

effective assistance of counsel.  (Dkt. No. 12-12 at 6.)

The state proceedings having run their course, Nowrang has now turned to federal court.

On February 10, 2017, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

---

[19] The Appellate Division held in the alternative that Nowrang had "received effective
assistance under the state and federal standards" to the extent the existing record permitted
review.  *People v. Nowrang*, 992 N.Y.S.2d 407 (App. Div. 1st Dep't 2014).

§ 2254, asserting a single ground for relief: that the New York courts unreasonably rejected his ineffective-assistance claim. (Dkt. No. 1.) This Court ordered a response (Dkt. No. 5), and the Office of the Bronx County District Attorney (the "State") filed its opposition to Nowrang's habeas petition on December 20, 2017 (Dkt. Nos. 12–13).

## II.      Legal Standard

Nowrang seeks relief from custody imposed as a consequence of a state-court judgment, and the ineffective-assistance claim he now advances was considered and rejected on the merits by the New York courts. Accordingly, Nowrang may prevail only if he shows that the state courts' adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In other words, Nowrang must show that the New York courts' rejection of his constitutional claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).

In Nowrang's case, moreover, this Court's review is "doubly deferential," *id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)), because in assessing Nowrang's underlying ineffective-assistance claim, the New York courts were required to "presume[]" that Trial Counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 22 (2013)). To succeed on his ineffective-assistance claim, after all, Nowrang needed to convince the state courts (1) that Trial Counsel's performance fell below an objective standard of "reasonableness under prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688 (1984),

notwithstanding a "presumption that, under the circumstances, [Trial Counsel's] challenged action[s] 'might be considered sound trial strategy,'" *id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)), and (2) that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different," *id.* at 694.

Ultimately, then, this Court can grant the requested relief only if Nowrang establishes "beyond any possibility for fairminded disagreement," *Woods*, 136 S. Ct. at 1151 (quoting *White*, 572 U.S. at 420), that Trial Counsel's litigation decisions could not have been made "in the exercise of reasonable professional judgment," *id.* (quoting *Burt*, 572 U.S. at 22), and that there is a reasonable probability that those unreasonable decisions tipped the ultimate verdict.

## III.    Discussion

Broadly speaking, Nowrang argues here, as he did in the state-court proceedings, that Trial Counsel fell short in four principal ways. First, Nowrang argues that Trial Counsel mishandled jury selection. (Pet. Memo. at 28–30.) Next, he argues that Trial Counsel conducted inadequate cross-examination of the State's witnesses. (Pet. Memo. at 31–33.) Third, he argues that Trial Counsel failed to object to the introduction of improper testimony and other evidence at trial. (Pet. Memo. at 33–38.) Finally, he argues that Trial Counsel failed to move for a trial order of dismissal following the close of the State's case.[20] (Pet. Memo. at 38.)

In considering these arguments, this Court does not write on a clean slate. The Bronx Supreme Court, after all, has already rejected each of them in arriving at its ultimate conclusion

---

[20] Pointing to the circumstantial nature of the case against him, and to certain gaps in the State's evidence, Nowrang further maintains that Trial Counsel's supposed deficiencies were prejudicial. (Pet. Memo. at 39–43.) But because this Court concludes, as explained below, that the state courts reasonably held that Trial Counsel rendered constitutionally adequate assistance, this Court has no occasion to reach questions of prejudice that the state courts never opined on. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (requiring a federal habeas court to "review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable").

that, "viewing the evidence and circumstances of [Nowrang's] case in totality, [Trial Counsel] provided [Nowrang] with meaningful representation" that satisfied the constitutional standard for efficacy. (Dkt. No. 12-7 at 10; *see also* Dkt. No. 12-12 at 10–11.) And the Appellate Division, in denying review without comment (Dkt. No. 12-8), presumably approved the Bronx Supreme Court's reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (holding that, for habeas purposes, a federal court should presume that an unexplained state-court opinion "adopt[s] the same reasoning" as "the last related state-court decision that does provide a relevant rationale").

This Court, then, asks only whether the state courts acted reasonably in concluding that Trial Counsel's performance satisfied the minimum constitutional guarantee. In conducting this inquiry, the Court considers Nowrang's four principal arguments in turn.

## A.  Deficient Performance at Jury Selection

Nowrang first contends that Trial Counsel underperformed at the jury-selection stage, observing that Trial Counsel spoke less and asked fewer questions of the prospective jurors than did the prosecutor, offered complimentary remarks about his adversary, and elicited a sarcastic comment from one prospective juror. [21]  (Pet. Memo. at 28–30.)

The New York courts reasonably rejected these claims. As for Nowrang's claim that Trial Counsel was ineffective for failing to question the potential jurors more thoroughly, the state courts reasonably held that "counsel's decision to [forgo] lengthy questioning of prospective jurors was a sound tactical decision." (Dkt. No. 12-12 at 8.) At every stage of jury selection, after all, Trial Counsel received the opportunity to question the prospective jurors only after the trial court and the prosecutor had already probed their backgrounds and possible biases.

---

[21] The 260-page transcript of the jury-selection proceedings begins at page 2 of Docket Number 14-1 and runs until page 40 of Docket Number 14-4. As with the trial transcript, citations to the voir dire transcript (abbreviated "VD Tr.") use the original's pagination.

As Trial Counsel explained to one set of potential jurors, "[h]aving heard so much already," he saw no need to "re-plow . . . ground" that had already been covered, and so he limited his questions to those "not [already] asked generally." (VD Tr. 251:6–16.)

Tellingly, Nowrang neither identifies any specific line of questioning Trial Counsel should have pursued,[22] nor offers any reason to believe that Trial Counsel lacked an informed basis for assessing potential jurors. Indeed, Trial Counsel probed potential jurors' law-enforcement connections (VD Tr. 133:1–9) and experience with domestic violence (VD Tr. 132:4–9, 224:18–225:4), and made deliberate use of his peremptory challenges (VD Tr. 101:16–18, 135:24–137:20, 228:15–231:11, 252:16–18). And to the extent Nowrang faults Trial Counsel merely for missing a chance to build rapport (Pet. Memo. at 28), the record supports the state courts' observation that Trial Counsel "addressed the prospective [jurors] on important issues such as reasonable doubt, [Nowrang's] lack of burden of proof and the absence of direct evidence of [Nowrang's] guilt." (Dkt. No. 12-12 at 8; *see* VD Tr. 93:24–97:3, 131:18–133:11, 222:24–225:23, 251:1–18.)

Nowrang next claims that Trial Counsel "complimented the prosecutor" in front of the prospective jurors. (Pet. Memo. at 29.) But Trial Counsel's collegial reference to his "very eloquent adversary" must be viewed in the context of his entire presentation, in which he reminded the potential jurors that, despite the prosecutor's rhetorical gifts, "[N]othing either of us has said to this point or will say is evidence in this case." (VD Tr. 95:17–21.) Likewise, after Trial Counsel told the prospective jurors that he "would buy a used car" from the prosecutor, he

---

[22] Unlike *McCullough v. Bennett*, 317 F. Supp. 2d 112 (N.D.N.Y. 2003), which Nowrang cites as an example of a case in which an attorney was held to be constitutionally ineffective for failing to adequately question prospective jurors, the instant case does not involve counsel's failure to follow up on a potential juror's express statement that he could not be impartial. In any event, *McCullough* was summarily reversed. *See* 143 F. App'x 379 (2d Cir. 2005).

was careful to caution them, "[N]o matter how persuasive [the prosecutor] is . . . , you realize you are the ones who have to evaluate the evidence." (VD Tr. 131:18–23.) These statements, and others like them, could very reasonably be seen as tactical attempts to cultivate an agreeable personality before the jurors while yet encouraging them to take their independence seriously.

Finally, Nowrang observes that Trial Counsel at one point "elicit[ed] a comical and sarcastic answer" from a potential juror (Pet. Memo. at 29) who, when asked whether she had "[a]ny lingering bitterness with men" following a divorce, responded, "I still like men" (VD Tr. 96:7–11). But the paper record offers no basis for Nowrang's characterization of the response's tone as "sarcastic." (Pet. Memo. at 29.) Even had the response been unequivocally snide, moreover, Trial Counsel's failure to anticipate a single juror's reaction to a legitimate, if perhaps inexpertly worded, line of inquiry would not have rendered his performance ineffective.

In sum, the state courts' conclusion that Trial Counsel's performance at jury selection satisfied constitutional standards was not unreasonable.

### B.      Insufficient Cross-Examination

Nowrang next claims that Trial Counsel "did not make the slightest effort to challenge the[] testimony" of Anita's sisters, "or the testimony of any other witness[,] through the crucible of cross-examination." (Pet. Memo. at 31.) In support of this claim, he points out that cross-examination takes up only thirty pages of a lengthy trial transcript and that Trial Counsel never attempted to undermine the credibility of Anita's sisters by showing that "their bias against the petitioner could have tainted their testimony." (*Id.*) In addition, he goes on, Trial Counsel's cross-examination on at least one occasion "elicited damaging testimony." (Pet. Memo. at 32.)

To be sure, "perfunctory" cross-examination can be an indicator of ineffectiveness where "the circumstances of th[e] case, viewed in their totality, reveal that the defense counsel . . . was so completely unprepared and so uninterested in and unfamiliar with the details of the

defendant's case" that counsel's omissions could not "arguably be considered mere losing tactics." *People v. Kilstein*, 571 N.Y.S.2d 781 (App. Div. 2d Dep't 1991). But despite Nowrang's claim that Trial Counsel "seemed totally unprepared and made no significant points whatsoever" during cross-examination (Pet. Memo. at 32), the state courts reasonably saw things differently.

While acknowledging that Trial Counsel did "curtail" his cross-examinations, the state courts saw his forbearance as a strategic choice to avoid "extensive cross-examination of the grieving family and friends of the decedent [that] might have alienated the jury." (Dkt. No. 12-12 at 8.) Nowrang responds by attempting to liken this case to *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003), in which the Second Circuit ordered an evidentiary hearing on an ineffective-assistance claim grounded in, among other things, trial counsel's failure to challenge the testimony of two sympathetic witnesses, *see id.* at 132–33. But beyond the fact that *Eze* announced no holding on the ultimate question of ineffectiveness, trial counsel in that case had failed to point out a specific "key inconsistency" that would have "significantly undermine[d] the [witnesses'] trial testimony." *Id.* at 133. Here, Nowrang has identified no specific matters that Trial Counsel failed to unearth.

To the extent that Nowrang's argument rests on the general contention that more aggressive questioning could have exposed Anita's sisters' bias against him, the state courts reasonably believed that it just as easily could have backfired by "result[ing] in the repetition of damaging testimony." (Dkt. No. 12-12 at 8.) Besides, the record reflects that Trial Counsel *did* raise the possibility of bias. In his opening statement, for example, he hinted that the feelings of Anita's relatives toward Nowrang "may color some of the testimony that you will hear. Sometimes familiarity breeds contempt. Maybe it even breeds a little coloration of testimony,

even testimony given under oath." (Tr. 16:16–22.) And when Nowrang's sister testified for the defense about the July 3, 2005 party at which Nowrang head-butted Anita and poured his drink on her, Trial Counsel elicited testimony that Anita's sisters were "so mad" at Nowrang that they refused to hear any explanation or to allow Anita to speak with the police on her own behalf. (Tr. 640:16–642:21.)

Furthermore, the state courts took the supportable view that Trial Counsel effectively utilized what cross-examination he did conduct "to elicit numerous points that he later employed on summation." (Dkt. No. 12-7 at 14–16.) For example, Trial Counsel elicited from a testifying medical examiner that the person who disarticulated Anita's body likely "had a great deal of expertise"—which Nowrang, apparently, did not. (Tr. 125:1–8; *see* Tr. 608:11–612:3.) Similarly, Trial Counsel cast doubt on the State's theory that the disarticulation occurred at the unlit Castle Hill Park by eliciting testimony that the culprit would have needed "lights to identify the appropriate joints, to make the appropriate incisions." (Tr. 125:9–126:7; *see* Tr. 75:9–10.)

Elsewhere, Trial Counsel established through cross-examination that there was nothing unusual in the fact that Nowrang had taken the morning of Anita's murder off from work (Tr. 175:15–23), that a cooler discovered at the crime scene in Castle Hill Park was "clearly" not a cooler Nowrang had purchased earlier that day (Tr. 581:13–20), and that the pair of shorts found at the Story Avenue house following Anita's murder had no stains on them (Tr. 284:19–24). Furthermore, when questioning Kamla Gokhul, the neighbor who claimed to have seen Anita's car leave the Story Avenue house around 4:30 on the morning of Anita's death, Trial Counsel sought to impeach her credibility by highlighting that her stated reason for being awake at that hour was that "[i]t takes a good two-and-a-half hours [for her] to get up, get [her]self ready,

[and] make breakfast" (Tr. 410:11–14)—a point to which Trial Counsel returned in his closing statement (Tr. 675:15–23).

To be sure, Trial Counsel's cross-examination was not always successful. As Nowrang points out, Trial Counsel's questioning of Anita's sister, Varo, revealed that Varo had once seen bruises on Anita's arms and face. (Tr. 153:6–14.) But although an attorney may be ineffective for failing to steer wide of foreseeable testimony that could provide "powerful and objective corroboration" of a disputed point and "obliterate[]" an otherwise available line of defense, *People v. Cyrus*, 848 N.Y.S.2d 67 (App. Div. 1st Dep't 2007), no such blunder occurred here. Nowrang's trial was replete with evidence of the physical abuse Anita suffered. Rather than undertaking the improbable task of convincing the jury that Nowrang had never hurt Anita, Trial Counsel pursued a strategy of arguing that it is "an incredible and unbelievable leap from . . . the kind of domestic abuse" that Nowrang had previously committed "to strangulation, dismemberment, disarticulation, disemboweling." (Tr. 684:1–12.)

The state courts thus reasonably rejected Nowrang's contention that Trial Counsel's cross-examinations exhibited a level of incompetence and unpreparedness capable of supporting an ineffective-assistance claim.

## C. Failure to Object

Nowrang's next line of argument is that Trial Counsel was ineffective for failing to object at trial to the introduction of certain testimony and other evidence.

As an initial matter, Nowrang points to the "astonishing fact" that Trial Counsel failed to "register a single objection throughout the entire trial." (Pet. Memo. at 34.) The Court agrees that this fact is striking. As discussed below, however, Trial Counsel did engage in extensive

pretrial efforts to exclude certain evidence.[23]  And, at any rate, failure to object does not in and of itself establish that counsel's performance was deficient.  The relevant issue, rather, is whether Trial Counsel unreasonably neglected to advance a meritorious objection.  *See, e.g.*, *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004) (finding counsel ineffective for unreasonably failing to object to a jury instruction that "contravened [a] longstanding holding" of the Supreme Court); *Mason v. Scully*, 16 F.3d 38, 44 (2d Cir. 1994) (finding counsel ineffective for unreasonably failing to object to an "obvious[] . . . impropriety" on the part of the prosecution).  The Court therefore turns to Nowrang's specific contentions.

First, Nowrang argues that Trial Counsel failed to object to the "massive amounts of out-of-court statements" the State introduced at trial.  (Pet. Memo. at 33.)  But Nowrang identifies no specific hearsay evidence that was admitted despite being, as he contends, "inadmissible and prejudicial."  (*Id.*)  Moreover, he misrepresents the record.  Prior to trial, Trial Counsel did indeed invoke hearsay rules as justification for seeking the exclusion of all testimony about Nowrang's physical abuse of Anita, "with the exception of those matters physically observed" or those matters memorialized in a contemporaneous official document.  (Dkt. No. 14 at 44:14–45:19.)  Indeed, although the trial court for the most part rejected Trial Counsel's pretrial hearsay objections, Trial Counsel succeeded in his "most strenuous objection" to the admission of hearsay testimony that would have offered the potentially prejudicial specifics of the sexual demands Nowrang had made of Anita.  (Dkt. No. 14 at 53:7–55:16.)

---

[23] In addition to challenging the hearsay and photographic evidence discussed below, Trial Counsel sought to exclude the statements Nowrang made to Detective Grant at the NYPD precinct office on the day of Anita's death.  (Dkt. No. 14 at 24:25–25:21.)

The state courts reasonably concluded that Trial Counsel acted strategically by declining to reiterate his unsuccessful hearsay objections at trial,[24] and by instead seeking to mitigate the potential damage of the admitted testimony by requesting that the trial court give the jury limiting instructions.  (Dkt. No. 12-7 at 16–19; *see* Tr. 81:12–24, 228:2–229:1, 453:25–456:9.)  To be sure, Nowrang believes that the instructions the trial court initially gave were insufficiently clear.  (Pet. Memo. at 33–34.)  But Trial Counsel proactively identified that potential problem and made the reasonable strategic choice to request that the trial court clarify the instructions during the final jury charge rather than disrupting the trial's flow with an immediate clarification.  (Tr. 457:10–20).

Second, Nowrang claims that Trial Counsel failed to object to the introduction of "horrific" photographs of Anita's remains.  (Pet. Memo. at 34–35.)  Here, too, Nowrang neglects the pretrial record.  Arguing at a pretrial hearing that the jury could be led "to appreciate the significance of [Anita's] wounds, disarticulation, cuts, without the need of actually seeing . . . extremely inflammatory photos," Trial Counsel offered to stipulate to the postmortem location of Anita's body parts in order to avoid the introduction of crime-scene and autopsy photographs.  (Dkt. No. 14 at 60:19–23, 62:14–19.)  The State, however, declined to accept Trial Counsel's proposed stipulation (Dkt. No. 14 at 62:24–63:1), and the trial court expressed skepticism about Trial Counsel's efforts to exclude the photographs, saying, "[T]o the extent your argument is

---

[24] Nowrang also briefly faults Trial Counsel for "conced[ing] the admissibility" of certain hearsay testimony (Pet. Memo. at 33) that the prosecution acknowledged might, on "a cold reading of the record," appear to have exceeded the bounds of the court's pretrial admissibility ruling (Tr. 178:19–179:3).  But Nowrang offers no reason that the state courts were unreasonable in concluding that Trial Counsel, after "carefully listening to the evidence as was elicited both on direct and cross examination," properly determined that the testimony at issue was in fact covered by the pretrial ruling and that a curative instruction would "satisfy any potential problems" the testimony might cause.  (Tr. 179:22–180:9.)

who needs photographs, the law of New York State seems to be they are appropriate in order to establish relevant matters" (Dkt. No. 14 at 61:19–22).

The record, then, bears out the state courts' reasonable conclusion that Trial Counsel thereafter acted strategically in directing his energies toward working with the State to "curtail[] the use of crime scene and autopsy photographs to the minimum necessary," rather than pursuing a likely "futile" course of "[c]ontinuous objection." (Dkt. No. 12-7 at 21.) After discussions with the State (Tr. 32:11–19), Trial Counsel acceded to the admission of six crime-scene photographs from Castle Hill Park that were sufficiently anodyne to foreclose "any possible claim of undue shock value or gruesome[ness]" (Tr. 148:2–13), as well as four photographs from Ferry Point Park, one of which "show[ed] nothing," two of which were "essentially long views of the [body] parts," and only one of which was a "closer photograph."[25] (Tr. 25:24–26:25). And out of sixty-seven available autopsy photographs, Trial Counsel consented to the admission of six that were "a little bit unpleasant in some respects, [but] not nearly as unpleasant" as some of the others.[26] (Tr. 462:22–463:25.)

Third, Nowrang argues that Trial Counsel should have objected to Angie's testimony that the value of the Story Avenue house appreciated by $420,000 during the time Anita lived there (Tr. 193:23–194:6) and to Detective Dingman's testimony that strangulation is a relatively clean and quiet murder method and that a garbage bag could be a "substitute . . . for a body bag in

---

[25] Trial Counsel also consented to the admission of two photographs from the sea wall in Queens where Anita's torso was recovered (Tr. 111:12–113:24), as well as three photographs of the thigh discovered at the Throgs Neck Bridge (Tr. 120:3–121:17).

[26] Nowrang also contends that Trial Counsel was ineffective for failing to request a limiting instruction to mitigate the prejudicial impact of the photographs. (Pet. Memo. at 35.) Trial Counsel, though, very well could have concluded that such an instruction would not have been worth the undue attention it might have drawn to the photographs—particularly given that the trial court would ultimately instruct the jury not to be "influenced in any way by bias or prejudice or sympathy." (Tr. 723:17–22.)

terms of transporting a body" (Tr. 277:7–12, 282:1–5). According to Nowrang, this testimony was improper because the respective witnesses were not experts "in the appraisal of real estate" (Pet. Memo. at 35) or "the neatest way to kill a person and the handiest way to dispose of a body" (Pet. Memo. at 37).

As for Angie's testimony, the state courts reasonably concluded that "counsel's failure to object was not so egregious as to amount to ineffectiveness," given that "the sale of the home would have inevitably generated some financial gain" and that "the exact value" of that gain— even if improperly introduced—was scarcely relevant. (Dkt. No. 12-7 at 23.) And as for Detective Dingman's testimony, the state courts reasonably concluded that Trial Counsel had no basis for objection, given that the detective in fact *was* "qualified as an expert in [the] field of crime scene investigation" and so was "qualified to testify about strangulation as a method of homicide and the disposal of a human body." (*Id.*; *see also* Tr. 240:17–242:8.)

Fourth, Nowrang faults Trial Counsel for failing to challenge two courtroom demonstrations that, in Nowrang's view, were unduly prejudicial and "almost surely would have [been] precluded" upon objection. (Pet. Memo. at 37–38.) In the first demonstration, the State asked Leon, Nowrang's son, to physically demonstrate for the jury the position in which he found his father when he walked in on his parents' June 18, 2005 bedroom altercation. (Tr. 329:13–330:15.) In the second demonstration, the State asked medical examiner Dr. Kappen to sit silently for three minutes as an illustration of the length of time it would take a victim to die from strangulation. (Tr. 511:6–18.)

The state courts, however, reasonably concluded that these demonstrations were properly admissible and that Trial Counsel was therefore not ineffective for failing to object. (Dkt. No. 12-7 at 24.) New York's high court, after all, has noted that "demonstrations in the courtroom

are not lightly to be rejected when they would play a positive and helpful role in the ascertainment of truth." *People v. Acevedo*, 40 N.Y.2d 701, 704 (1976). Here, the state courts determined that the in-court demonstrations played such a role, finding the reenactment of the fight—which involved choking and hair-pulling—"relevant in light of [Dr. Kappen's] testimony that the victim died in a strikingly similar way," and finding Dr. Kappen's three minutes of silence illustrative of "the intensity and single-minded determination of Anita's killer, which, of course[,] was material to whether the fatal attack was randomly perpetrated."[27] (Dkt. No. 12-7 at 24 (quoting Dkt. No. 12-6 at 34).)

Finally, Nowrang claims that Trial Counsel should have objected when the State asked Nowrang's mother, "without any apparent good faith basis," whether Nowrang had experience slaughtering livestock. (Pet. Memo. at 38–39; *see also* Tr. 607:15–23.) Nowrang's mother, though, answered in the negative (Tr. 607:24–608:20), and the trial court had previously instructed the jury not to "infer a fact from the mere asking of a question" because "[q]uestions by themselves are not evidence" (Dkt. No. 14-4 (Prelim. Instructions) 6:20–22).[28] The state courts reasonably concluded that Trial Counsel could have refrained from objecting out of a strategic desire to avoid giving the jury the impression that Nowrang had something to hide. (Dkt. No. 12-7 at 22.)

---

[27] Of course, not every reenactment is reasonably deemed admissible. Nowrang cites *People v. Feuer*, 782 N.Y.S.2d 858 (App. Div. 2d Dep't 2004), for example, for the proposition that the prejudicial nature of a "courtroom re-enactment of [a] defendant's altercation with [his] victim" can outweigh its probative value. (Pet. Memo. at 38.) In *Feuer*, however, the prosecution had asked *the defendant himself* to reenact a murder in front of the jury. Nothing so blatantly prejudicial occurred here.

[28] Contrary to Nowrang's suggestion (Pet. Memo. at 39), the circumstances here are unlike those in *People v. Peterson*, 468 N.Y.S.2d 955 (App. Div. 4th Dep't 1983), where, during the prosecution's summation, defense counsel failed to object to baseless assertions about the defendant's criminal history.

All told, Nowrang has failed to establish that it was unreasonable for the state courts to conclude that Trial Counsel could have been strategically declining to supplement his pretrial efforts with likely futile and potentially disruptive objections during trial.

### D. Failure to Move for a Trial Order of Dismissal

Nowrang's final contention is that Trial Counsel was ineffective for failing to move for a trial order of dismissal at the conclusion of the State's case. (Pet. Memo. at 38.) Trial Counsel, however, *did* move for such an order, although he waited to do so until the close of all the evidence—a juncture at which a more defendant-friendly standard would apply.[29] (Tr. 593:12–594:25; *see also* Tr. 665:10–16.) The state courts thus reasonably held Nowrang's claim to be "refuted by the trial record." (Dkt. No. 12-7 at 24–25.)

## IV. Conclusion

For the foregoing reasons, Nowrang's petition for a writ of habeas corpus is DENIED.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this opinion and order would not be taken in good faith and therefore denies *in forma pauperis* status for the purpose of an appeal.

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: December 28, 2018
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[29] Nowrang vaguely contends that Trial Counsel failed to argue this motion adequately (Pet. Memo. at 38), but he identifies no specific matters that Trial Counsel failed to raise.